**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cr-195 CKK** |
| | ) | |
| **SALVADOR SANDOVAL** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

<u>**DEFENDANT'S SENTENCING STATEMENT**</u>

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

## I.    **Introduction**

Comes now Defendant Salvador Sandoval, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on August 7, 2023.

Mr. Sandoval appears for sentencing before this Court having been convicted at a bench trial on all eleven counts in the indictment filed against him, including seven felonies and six misdemeanor offenses.

Stripping away the numerical statistics, Mr. Sandoval's conduct boils down to efforts by him, along with others, to wrestle shields away from two U.S. Capitol Police officers – one successful and one not – and two incidents of physical contact with Officer Choi, neither of which involved any type of fighting, nor was Officer Choi injured in any way by Mr. Sandoval's conduct.

In addition, Judge Hogan found that Mr. Sandoval violated Sec. 231 (Civil Disorder) and Sec. 1512 (Obstruction of an Official Proceeding).  Both violations are based on the same sequence of events involving his 15-20 minute stay inside the Great Rotunda of the Capitol.

Mr. Sandoval did not engage in any violence to get into the Capitol, he did not engage in any violence to overcome police lines outside the Capitol, and he did not destroy any property either inside or outside the Capitol.

Based on a consideration of his actual conduct, a recommended Guideline Range of 70-87 months grossly exceeds what is necessary or appropriate when considering the Sec. 3553(a) factors as set forth in more detail below.

## II.   <u>The Offense Conduct</u>

Mr. Sandoval was convicted following a one-day bench trial before the Honorable Thomas F. Hogan.  Judge Hogan recited his verdict from the bench after the close of the evidence and hearing the arguments of counsel.  Judge Hogan's verdict included references to specific items of evidence and specific findings of fact made by him on the basis of the evidence presented, both documentary and testimonial.  The following comments are not intended to contradict any of the findings made by Judge Hogan, but rather to supplement and provide context to the PSR based on Judge Hogan's findings.

Par. 24:  Mr. Salvador was one of several rioters involved in dispossessing Off. Lazo of her shield.  Mr. Salvador only had one hand on her shield at the time she let go.  Other rioters were also pulling on her shield.

Beyond that, the Offense Conduct section of the PSR is consistent with the rulings of Judge Hogan as to the evidence on the counts of conviction.

## III.   <u>Sentencing Guidelines Calculation</u>

The Probation Officer has broken down the counts of conviction into three groups because of the multiple convictions of Sec. 111(a) do not group together under the sentencing guidelines.

The first group involves the convictions under Sec. 231 (Count 1 -- civil disorder), Sec. 111(a) (Count 2 – Assaulting, impeding, etc), Sec. 1512(c) (Count 6 -- obstruction of Congress), and the three "A" misdemeanors under Sec. 1752 (Counts 7, 8, and 9).

The second group involves two Sec. 111(a) counts involving the same victim, Officer Choi.

The third group involves the final Sec. 111(a) count involving Officer Mendoza.

As determined by the Probation Officer, Guideline Sec. 2J1.2 applies to the Sec. 1512 offense.  The base offense level is 14.

The Probation Officer then applies enhancements under Sec. 2J1.2(b)(a)(B) and 2J1.2(b)(2) -- +8 levels and +3 levels respectively.

A. <u>The +8 and +3 Level Enhancements Under Sec. 2J1.2(b) Do Not Apply</u>

Mr. Sandoval objects to the application of these two enhancements on the basis that an "official proceeding" which, in this case, is a congressional proceeding, does not fall within the meaning of the phrase "administration of justice" as that term is used on both guideline enhancements.[1]

1. Sec. 2J1.2(b)(1)(B) -- +8 Levels

The factual basis necessary for the application of this enhancement is that the offense conduct involved <u>causing or threatening physical injury</u> to a person, or property damage, in order to obstruct "the administration of justice."

The offense conduct here involved actions that hindered and impeded police officers in the Great Rotunda of the United States Capitol – but where there were no injuries or threats to injure involved on January 6.

---

[1] Defendant Sandoval recognizes that this Court has previously rejected these arguments in <u>United States v. Wright</u>, 2023 WL 2387816 (D.D.C. 2023).  But as the Court noted in that case, the view of the District Judges in this District has not been uniform on this question and the issue will likely be determined ultimately by the Circuit Court of Appeals.  Defendant makes the arguments here for the record and intends no disrespect towards this Court or its prior ruling on this issue.

Threats made on social media or elsewhere prior to January 6 cannot be said to have obstructed the proceedings because they had not yet begun, and there is no causal connection in the record evidence of the case between any such threats made by Mr. Sandoval, and the actual events on January 6 that obstructed the congressional proceedings.

Further, the phrase "administration of justice" is described in Application Note 1 as involving processes or procedures that fit within the following parameters:

> "a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."

For the +8 level enhancement to apply, the offense conduct must fall within the ambit of "administration of justice" as that phrase is used.  The description set forth in Note 1 can be divided into three parts – before the semi-colon following the word "investigation," and before and after the semicolon following the word "evidence."  The first two portions of the definition fit a textual interpretation of "administration of justice" as a reference to a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights.  These segments of Note 1 refer to "investigations," "verdicts," and "judicial determinations" – all of which involve the coercive force of the state and the actual or potential determination of legal rights in judicial or enforcement proceedings, but not "congressional proceedings."  Only the third part of Note 1 provides a plausible rationale.  But close analysis shows the rationale does not hold up.

In other cases where this issue has been disputed, the Government has relied upon the final phrase involving the "unnecessary expenditure of substantial Governmental . . . resources" as the basis for applying the enhancement and finding a "congressional proceedings" to be under the umbrella of "administration of justice."  But to do so one has to omit from this final clause the phrase "or court."

Rules of statutory construction requires that words of a statute be "associated in context" when they are used together in a sentence.  The question is what is meant by the imprecise word "government" as used in Note 1?  Is that a reference to the collective three branches of the federal government, of which the Legislative Branch is one?  Or is it a term meant to be synonymous with the Executive branch – thereby excluding the Legislative branch, and "congressional proceedings," from the phrase?

If the former – if "Government" is meant as a reference to the federal government as a whole -- then the words "or court" that follows are superfluous to the sentence when "government" and "court" are read together.

On the other hand, reading "government" as synonymous with the Executive branch gives meaning to the remainder of the sentence where "court resources" are included – a clear reference to the Judicial branch.

Thus, "government resources" is most accurately read to be the expenditure of resources of the executive branch in its function as the prosecutorial entity in judicial or quasi-judicial proceedings.  As such, the expenditure of "government" resources does not bring a "congressional

proceedings" under the umbrella of "administration of justice" for purposes of the application of Sec. 2J1.2(b)(1)(B).

> 2.    Sec. 2J1.2(b)(2) -- +3 Levels

Mr. Sandoval objects to the +3 level enhancement under Sec. 2J1.2(b)(2) on the same basis as his objection above, i.e., the offense conduct does not involve interference with the "administration of justice."

> B. The Sentencing Guideline For Sec. 111(a) Counts is 2A2.4.

Offenses under Sec. 111(a) are indexed in the Sentencing Guidelines to both Sec. 2A2.2 and Sec. 2A2.4.

The range of offense conduct that constitutes a violation of 18 U.S.C. Sec. 111(a) is extraordinarily broad.  Anyone who "assaults," "resists," "opposes," "impedes," "intimidates," or "interferes" with a covered law enforcement officers violates the statute.

The verdict made the special finding that Mr. Sandoval's conduct was done with the intent to commit another felony, i.e., "civil disorder" in violation of 18 U.S.C. Sec. 231.   That finding makes the 111(a) offense a felony rather than a misdemeanor.  There were no "bodily injuries" and there was no dangerous weapon used – the other two manners in which a 111(a) offense can be a felony.

The question at sentencing is which Guideline is applicable since Sec. 111 is referenced in Appendix A as being covered by both 2A2.2 and 2A2.4.

Sec. 2A2.2 is captioned "Aggravated Assault."

Sec. 2A2.4 is captioned "Obstructing or Impeding Officers."

The PSR applies Sec. 2A2.2 without any explanation why that section is appropriate rather than Sec. 2A2.4.

The crime of "assault" is defined by Black's Law Dictionary as "Any willful attempt or threat <u>to inflict injury</u> upon the person of another, <u>when coupled with an apparent present ability to do so</u>, and any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm."

While it is true that in the verdict he announced from the bench at the conclusion of the trial Judge Hogan did reference Mr. Sandoval's conduct as constituting "assault", he did so in announcing his verdict in the context of the language of the statute.  He repeatedly referenced the conduct as "forcibly assaulting, resisting, opposing," etc.. the law enforcement officers involved in the charged counts.

The evidence as described by Judge Hogan involved three distinct episodes that resulted in four separate convictions under Rule 111(a).

The first episode is the successful effort by Mr. Sandoval and others to take away by force the police shield held by Officer Lazo.

The second episode involved the two instances of physical contact between Mr. Sandoval and Officer Choi – with a separate Sec. 111(a) count for each instance which were separate in time.

The third episode involved the unsuccessful effort to take by force from Officer Mendoza the shield he possessed.

It is not contested that none of the three officers suffered any injury as a result of Mr. Sandoval actions as found by Judge Hogan.

With respect to whether Mr. Sandoval should be sentenced based on "Aggravated Assault" (Sec. 2A2.2) under the Guidelines as opposed to "Obstructing or Impeding Officers" (Sec. 2A2.4), the key to answering that question is the actual conduct of Mr. Sandoval in committing the four Sec. 111(a) violations as found by Judge Hogan.  Specifically, does the evidence of the offense conduct reflect that Mr. Sandoval intended to "inflict injury" on any of the officers by his conduct, or was he merely intending to interfere in their efforts to do their job?

There is no question that based on Judge Hogan's findings, the defendant intended to engage in "civil disorder" by his conduct, and there is no question that the defendant intended to resist, interfere, obstruct, etc., the efforts of the three officers to carry out their lawful functions.   But the facts of each offense show obstructive conduct – not assaultive conduct with an intent to injure.

As Judge Hogan found, Mr. Sandoval had only one hand on Officer Lazo's shield, with other protesters also having their hands on her shield. Collectively they forced her to release her own grip.  Mr. Sandoval does not end up in possession of Officer Lazo's shield, and never makes any overt act in her direction with the shield or otherwise that might be deemed threatening.  But based on Judge Hogan's findings, the successful effort to forcibly wrest the shield from her possession certainly interfered and impeded her ability to do her job.

The third episode is similar to the first episode, except that Officer Mendoza was able to maintain possession of his shield.  The use of force by Mr.

Sandoval is the same, but again there is no evidence that Mr. Sandoval intended to harm Officer Mendoza by his conduct. Since neither Mr. Sandoval nor any of the other protesters dispossessed Officer Mendoza of his shield, there was no threat to Officer Mendoza in the aftermath of the altercation.  But it certainly "obstructed and impeded" Officer Mendoza in his effort to perform his lawful duties on January 6.

The episode involving Officer Choi is the closest to common law "assault" as Judge Hogan found there were two episodes of purposeful and unwanted physical contact initiated by Mr. Sandoval against Officer Choi.

As described by Judge Hogan, the first incident was an apparently unprovoked movement by Mr. Sandoval to "shoulder" Officer Choi who was standing next to him.  This description by Judge Hogan is to Mr. Sandoval using his shoulder – as opposed to his arm, hand, leg or foot – to initiate contact with Officer Choi when Officer Choi was not engaged in any activity directed at Mr. Sandoval.   The video shows that the effort by Mr. Sandoval was seemingly to either knock Officer Choi off-balance or to move him from the position where he was standing.  Again, the evidence reflects a lack of any intent to injure Officer Choi, and Officer Choi was not injured.  Officer's Choi's immediate reaction is best characterized as one of surprise – but the scene around him is in the process of becoming more chaotic.

This action did not make Officer Choi's performance of his duties easier – it made the more difficult as it forced him to direct his attention at Mr. Sandoval rather than other protesters or the efforts of other law enforcement officers to manage the crowd or regain control of the Rotunda area.

The second episode involving Officer Choi is similar.  At a moment when Officer Choi was bending over another protester who was on the ground, Judge Hogan found that Mr. Sandoval moved a short distance to where Officer Choi was and forcibly pushed him away from the protester on the ground.  Again, Judge Hogan described the conduct as a "hard push" and not an offensive blow from which an intent to injure might be inferred.  As with the first incident, Officer Choi was not injured but he was certainly interfered with as he attempted to perform his lawful duties with regard to the protester who was on the ground.  As Judge Hogan noted, Mr. Sandoval may have believed he was coming to the assistance of the protester on the ground, but any such belief was mistaken.  That recognition, however, supports the conclusion that Mr. Sandoval was not intended to injury Officer Choi, he was only attempting to interfere or impede Officer Choi in doing whatever he was doing in connection with the second protester who was on the ground.

All four episodes fit more accurately within offense conduct covered by Sec. 2A2.4, rather than 2A2.2, and the former guideline should be applied in this case.

C. The Cross-Reference Under 2A2.4(c)(1) Does Not Apply.

If the Court agrees that 2A2.4 is the appropriate Guideline when taking into consideration the nature and specific actions of the offense conduct as found by Judge Hogan, there remains the issue of whether the Cross-Reference in Sec. 2A2.4(c)(1) nevertheless directs the Court back to Sec. 2A2.2 as proposed by the Probation Officer.   The Cross-Reference provides that if the

offense conduct involves "aggravated assault", the Court should apply Sec. 2A2.2.[2]

The structure of Section 111(a) created by Congress establishes misdemeanor and felony versions of a wide range of prohibited conduct, depending on the presence or absence of one or more specific aggravating factors. It includes both misdemeanor and felony versions of assault, and then a third classification known as "aggravated assault" with regard to the felonious form for which a longer maximum sentence is provided for the felony if "aggravating" facts are present.

Section 111(a) reads as follows in pertinent part:

(a) In General. —Whoever—

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; ...

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

The statutory text makes no reference to "aggravated assault." What it does is define two classes of broadly described offense conduct, with the status of misdemeanor v. felony versions depending on the existence of an additional fact, i.e., "physical contact with the victim" or "intent to commit another

---

[2] The Probation Officer has not relied on the cross-reference, but instead opted to apply Sec. 2A2.2 without explaining the basis for that decision.

felony...."   Any felony under Sec. 111(a) must involve one of these two features, otherwise the offense is a misdemeanor.

In addition to Sec. 111(a), subsection 111(b) includes additional factual findings – where the offense results in serious bodily injury or a dangerous or deadly weapon was used in the felony version of Sec. 111.  Such additional facts create an "aggravated" form of the offense, and the maximum penalty is increased from 8 to 20 years.

A problem arises under the cross-reference in Guideline Section 2A2.4(c) which reads: "If the *conduct* constituted *aggravated assault*, apply §2A2.2 (Aggravated Assault)."  [Emphasis added].

As noted, "aggravated assault" is not explicitly set out in the statute, but an aggravated version of felony assault is provided for with a 20 year statutory maximum rather than an 8 year statutory maximum for a non-aggravated felony.

But the Guidelines do purport to provide a definition of "aggravated assault" – not in the Guideline itself but in the Commentary to Section 2A2.2. The definition reads:

> "Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.  [Emphasis added].

The definitional Subsections (A), (B), and (C) do not apply.

But that leaves the question of whether (D) should be followed – sending the Court back to Sec. 2A2.2 – since Judge Hogan found in his verdict that in

violating Sec. 111(a), Mr. Sandoval did intend to commit another felony, to wit:

a violation of Sec. 231 – Civil Disorder.

**2.** Civil Disorder Cannot be "Another Felony" for Purposes of the Cross-Reference at §2A2.4(c)(1)

The Court expressly stated in its verdict that the same conduct which

supported the guilty verdict on Counts 2, 3, 4, and 5 also established Mr.

Sandoval's guilt as to Count 1 charging "Civil Disorder."   Mr. Sandoval

contends that the same offense conduct establishing two simultaneous crimes

does not meet the requirement that there be an intent to commit "another

felony" that would trigger the cross-reference in Sec. 2A2.4(c).

This specific issue was considered by Judge Amy Berman Jackson at the

sentencing hearing in United States v. Hamner, 21-cr-689:

> It strikes me that the Commission is asking: Did you commit the assault with the intent to commit some other offense? It didn't mean with the intent to commit that exact same assault, just charged differently. They could have easily defined 'another offense' as any offense with any different elements that's a different offense, but they didn't.

> It's also important to note that the cross reference says you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.

Sentencing Transcript, United States v. Hamner, 1:21-cr-689, p. 20:21-25, p.

21:1-11.3.

As expressed by her, and as she ultimately applied it in Hamner, Judge

Jackson found that the "intent" to commit "another felony" could not be the

same "intent" as found with the first felony – the Sec. 111(a) offense.  Two crimes committed simultaneously, found based upon the same *mens rea* and *actus reus,* cannot be both the felony and the required "another felony" to trigger the cross-reference in Section 2A2.4(c).

If Judge Jackson's view were to be applied by the Court here, the fact that the same conduct underlies both the Sec. 111(a) convictions and the Sec. 231 conviction means that the latter is not "another felony" as contemplated in the cross-reference in Sec. 2A2.4(c) in that it was not a latter or subsequent crime with a separate *mens rea* from that found by Judge Hogan for the Sec. 111(a) offense.

Taking the issue one step further, Judge Berman Jackson noted "at best, the cross reference is ambiguous. And under such circumstances the Rule of Lenity requires the adoption of the definition that favors the defendant." Id. at p. 24:1-3.

For Mr. Sandoval, the drastic difference in his guideline calculation under the two respective Guideline Sections must be noted.   Under Sec. 2A2.2, the base offense level increases by 4, and the official victim enhancement only applies under Sec. 2A2.2, adding another 6 levels.  There is only one applicable enhancement under 2A2.4, for having physical contact with the officers:

Sec. 2A2.2                              Sec. 2A2.4

| | |
|---|---|
| Base Offense Level 14 | Base Offense Level 10 |
| Official Victim:  +6 | N/A |
| N/A | Physical Contact with Victim +3 |

| Adjusted Offense Level: 20 | Adjusted Offense Level: 13 |
|---|---|
| Crim. Hist. Cat. 1 | Crim. Hist. Cat. 1 |
| GL Range:  33-41 months | GL Range: 12-18 months |

### 3.  The Sentencing Guidelines' Definition of "Aggravated Assault" is Unreasonable and Not Entitled to Deference

The definition of "aggravated assault" is found not in the Guideline itself, but only in the commentary to the guideline.  This distinction is important because the commentary to the Sentencing Guidelines is not accorded the full force of the guideline, but rather is considered as "an agency's interpretation of its own legislative rule."  Stinson v. United States, 508 U.S. 36, 44 (1993). This Circuit has said that the Sentencing Guideline's application notes do not qualify for deference under Stinson if they "expand[] rather than interpret[] the Guideline." United States v. Winstead, 890 F.3d 1082, 1091 (D.C. Cir. 2018). Further, the Supreme Court recently stated there are important limits to the deference courts give to an agency's interpretation of its own rules. See generally Kisor v. Wilkie, 139 S. Ct. 2400, 2424-2418 (2019).

To be granted deference, the agency's interpretation must be of a regulation that is genuinely ambiguous. Kisor, 139 S. Ct. at 2415.  Genuine ambiguity cannot be determined based solely on the plain language of the regulation.  Instead, courts must exhaust all the "traditional tools" of construction, including consideration of the text, structure, history and purpose of the regulation. Id. (citations omitted).

The United States Sentencing Commission created three separate guidelines for assaultive conduct: Aggravated Assault (§2A2.2), Assault (§2A2.3) and Obstructing or Impeding Officers (§2A2.4).

Congress created a different structure in Sec. 111 for "Assaulting, Resisting, or Impeding Certain Officers," one that includes three degrees of criminal responsibility:

> 1) simple assault, a misdemeanor punishable by not more than 1 year;
>
> 2) assault involving physical contact with an officer, or the intent to commit another felony, punishable by up to 8 years; and
>
> 3) assault involving a dangerous weapon or bodily injury, punishable by up to a maximum of 20 years.

The first two are found in Sec. 111(a), and the third is found in Sec. 111(b).

Congress separated Subsection 111(b) and explicitly titled it "Enhanced Penalty," making a clear distinction in the statute with both the structure of the statute and the escalating punishments. The only offenses that qualify for an "enhanced penalty" of up to 20 years in prison are those that involve a dangerous weapon or bodily injury.

Physical contact and the "intent to commit another felony" make the offense a felony and subject the defendant to a greater potential sentence than simple assault but are not within the category of an enhanced penalties of Sec. 111(b). The structure of the statute creates a misdemeanor, felony, and aggravated felony version of the offense. Section 111(b) is the "aggravated" form of the felony, not the felony version of the 111(a) offenses.

These distinctions, enacted by Congress, provide important context when determining the how much respect should be given to the U.S.S.G definition of "aggravated assault" in the commentary.  The Guidelines are only advisory, and the Commentary only offers guidance – it is not binding.  To the extent there is an inconsistency with a statute, the commentary has even less value in terms of what weight should be afforded to the definition.

The commentary involves four categories of what offenses the Commission deems to be "aggravated assault."  Three of them are directly tied to Congress's the statutory framework in Sec. 111(b):

1) use of a dangerous weapon,

2) bodily injury, and

3) strangulation, which by its nature carries a serious risk of bodily injury. See USSG § 2A2.2, Application Note 1.

The 4th category – intent to commit another felony – is unrelated to bodily injury or the risk thereof.  The definition in the commentary lifts the "intent to commit another felony" variation – a felony – and deposits it into the more serious category an "aggravated" felony than in the case in the statute.  The commentary creates an equivalency between different felonies for which Congress has expressly set 8 and 20 year maximum penalties – making them far from equivalent in their seriousness.

The Commentary definition made the "intent to commit another felony" prong of Sec. 111(a)(1) tantamount to the "aggravated" forms of assault under the "enhanced penalty" prong of Sec. 111(b), even though the statutory maximums for the different prongs vary by 12 years.

Further -- without explanation -- the Commentary does not elevate the "physical contact" prong of Sec. 111(a)(1) into the definition of an "aggravated assault." There is no justification for the Sentencing Commission to treat the two prongs of Sec. 111(a)(1) differently from each other in clear contravention of the classifications created by Congress. For these reasons, USSG § 2A2.2 is not genuinely ambiguous and thus no deference should be given to the commentary that elevates the intent to commit another felony to an "aggravated assault." The definition of aggravated assault can be determined directly through the traditional tools of construction by examining the relevant statute directly.

The Court should use Sec. 2A2.4 for Counts 2 through 5. This common-sense approach to the facts and the Guidelines shows that Sec. 2A2.4 is the guideline that most appropriately fits the facts of this case. Even if the Court were to find Sec. 2A2.2 is genuinely ambiguous, and the Commentary definition was instructive, an agency's interpretation must still be "reasonable" for it to control. Kisor ,139 S. Ct. at 2415 (citation omitted). There the Supreme Court was clear: "And let there be no mistake: That is a requirement the agency can fail." Id. at 2416.

The Sentencing Commission's definition fails the reasonableness test by making assaults with the "intent to commit another felony" equivalent to assaults that included use of a deadly weapon or risked bodily injury. This is an unreasonable interpretation given the statutory framework created by Congress. An intent to commit another felony, by itself, does not make an

assault equally serious as one that creates risk of bodily injury or employed a deadly weapon.

Mr. Sandoval's Proposed Guideline Calculations:

Mr. Sandoval agrees that under the "Grouping" provisions of the Guidelines, because the Sec. 111(a) offenses do not group together, there should be three groups of counts.

Group 1:  Counts 1, 2, 6, 7, 8, and 9.

Mr. Sandoval agrees that the base offense level is 14 pursuant to 2J1.2.

Mr. Sandoval objects to the +8 and + 3 level enhancements under Sec. 2J1.2(b) as noted above.

Adjusted Offense Level                               14


Group 2: Counts 3 and 4

Guideline Sec. 2A2.4 applies and the base offense level is 10

A +3 enhancement applies under Sec. 2A2.4(b)(1).

Adjusted Offense Level                               13

Group 3:  Count 4

Guideline Sec. 2A2.4 applies and the base offense level is 10

A +3 enhancement applies under Sec. 2A2.4(b)(1).

Adjusted Offense Level                               13

Multiple Count Adjustment:                               +3

Total Offense Level                               17

Mr. Sandoval has no criminal history points as determined by the United States Probation Officer in the Presentence Report. As a result, Mr. Sandoval's Criminal History Category I.

Based on a Total Offense Level of 16, and a Criminal History Category of I, Mr. Sandoval submits that the advisory Guideline Range is 24-30 months.

## IV.   Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Sandoval's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

      1.   Nature and circumstances of the offense and the history and personal characteristics of the defendant.

      a. The Nature and Circumstances of the Offense.

As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence to disrupt the congressional certification of the 2020 Electoral Vote.

2) a larger number of protesters who intended to protest loud and raucous manner as a manifestation of their unhappiness and distrust with the reported outcome of the 2020 Presidential election -- but with no

predetermined intention to engage in violent behavior towards law enforcement or any other individuals – some of whom were drawn into committing acts of violence once at or inside the Capitol; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

The findings by Judge Hogan seem to place Mr. Sandoval in the second group.  Judge Hogan referred to substantial evidence showing Mr. Sandoval came to the Capitol possessing a distrust and unhappiness towards the outcome of the 2020 election and wanting to be part of the protest activity both at the Ellipse and later at the Capitol to express his views along with a group of like-minded supporters of former President Trump.

He did not engage in any acts of violence either on his way to the Capitol building entrances or as part of his efforts to get inside the building.  The offense conduct as found by Judge Hogan all took place while he was inside building in the area near the Columbus Doors and entrance into the Capitol Rotunda.

While the judgements of Judge Hogan are that Mr. Sandoval forcibly made physical contact between himself and the three officers listed as victims, the evidence cannot fairly be characterized as evidencing an intent on his part to inflict any bodily injury on the Officers by his actions.  As found by Judge Hogan, Mr. Sandoval's conduct did forcibly interfere, obstruct, impede, etc., the police officers in their efforts to lawfully carry out their duties in the location where Mr. Sandoval was.  Mr. Sandoval drew their attention to him, he interfered with their physical movements, and he obstructed their efforts to

deal with other protesters in the same area.  His actions involved physical contact with the officers, but the contact lacked an intention to injure any of the three officers involved, and none of the three officers were injured.

   b. <u>History and Personal Characteristics of Mr. Sandoval</u>.

  As is made clear by the PSR, there is no significant factor in Mr. Sandoval's prior life or upbringing that provides much insight or context for his actions on January 6.  It is noteworthy that he was only 23 years old on that day.  He traveled to Washington D.C. from Iowa with his mother.  She was also arrested and charged in connection with her conduct and has been sentenced by this Court.

  It would be accurate to say that on January 6 Mr. Sandoval was greatly influenced in his thinking by the political views of his mother.   They were in close communication after being separated that day, with both exchanging messages of exhilaration and being energized by their experiences that day.

  Mr. Sandoval has lived his entire life in Iowa and is a high school graduate. He is the third youngest of seven children.  His parents divorced approximately 10 years ago, but his family support network is largely intact.

  Mr. Sandoval admits to a relatively significant history of abusing controlled substances and alcohol going back to his early teenage years.  He denies having ever been involved in substance abuse treatment programs and certainly would benefit from any such opportunities afforded to him by the

Bureau of Prisons.  The Defendant requests that the Court recommend the

RDAP program of the Bureau of Prisons.[3]

DEFENDANT'S SENTENCING RECOMMENDATION

Salvador Sandoval came to Washington D.C. with his mother for the Stop

the Steal rally at the Ellipse on January 6, and to protest at the U.S. Capitol

the announced outcome of the 2020 Presidential Election.  While engaged in

that protest with thousands of like-minded individuals he succumbed to a mob

mentality just inside the Capitol when he came face-to-face with uniformed law

enforcement officers.  But even in the moments when he lost his composure

and committed the acts as found by Judge Hogan in his verdicts, his conduct

was not motivated by and did not include an intent to do bodily harm or inflict

any injury on the officers in question.

The bottom of the guideline range for such conduct should be the

starting point for this Court's consideration of an appropriate sentence. From

there the Court should take into consideration the mitigating factors involving

Mr. Sandoval's age and lack of life experiences up to that point as reflected in a

lack of maturity and lack of impulse control.

Mr. Sandoval has never shown himself to be a threat to the community

in which he has lived nearly his entire life.  A lengthy period of incarceration –

relative to others whose conduct was similar – is not warranted by

---

[3] Counsel for the Defendant had limited success in obtaining the input of the Defendant or his family with regard to the Personal History and Characteristics portion of the final draft of this Sentencing Statement.  The Alexandria facility where he is held has communicated that when it is short-staffed, scheduled attorney-client calls oftentimes cannot be completed because the facility lacks a staff member to escort the inmate to make the call.  Counsel will continue to make efforts to contact Mr. Sandoval and if there is any meaningful information that needs to be provided to the Court, Probation and the Government, counsel will file a Supplement to this Statement.

considerations of safety or the need to punish for purposes of making him an example.

Based on a totality of factors, a downward variance to a sentence of 18 months – from a recommended guideline range of 24-30 months -- is fair and just sentence that takes into account an accurate reflection of the facts as they relate specifically to Mr. Sandoval and his conduct.

Date: July 26, 2023                          Respectfully Submitted,


/s/ William L. Shipley
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*